**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID L. MCCORKLE; WILLIAM L.
PENDER,

       *Plaintiffs - Appellants,*

       and

ANITA POTHIER; KATHY L. JIMENEZ;
MARIELA ARIAS; RONALD R.
WRIGHT; JAMES C. FABER, JR., On
behalf of themselves and on behalf
of all others similarly situated,

       *Plaintiffs,*

       v.

BANK OF AMERICA CORPORATION;
BANK OF AMERICA, NA; THE
BANK OF AMERICA PENSION PLAN;
THE BANK OF AMERICA 401(K)
PLAN; BANK OF AMERICA
CORPORATION CORPORATE BENEFITS
COMMITTEE,

       *Defendants-Appellees,*

       and

No. 11-1668

BANK OF AMERICA TRANSFERRED
SAVINGS ACCOUNT PLAN; UNKNOWN
PARTY, John and Jane Does #1-50,
Former Directors of NationsBank
Corporation and Current and
Former Directors of Bank of
America Corporation & John &
Jane Does #51-100,
Current/Former Members of the
Bank of America Corporation
Corporate Benefit;
PRICEWATERHOUSECOOPERS, LLP;
CHARLES K. GIFFORD; JAMES H.
HANCE, JR.; KENNETH D. LEWIS;
CHARLES W. COKER; PAUL FULTON;
DONALD E. GUINN; WILLIAM
BARNETT, III; JOHN T. COLLINS;
GARY L. COUNTRYMAN; WALTER E.
MASSEY; THOMAS J. MAY; C.
STEVEN MCMILLAN; EUGENE M.
MCQUADE; PATRICIA E. MITCHELL;
EDWARD L. ROMERO; THOMAS M.
RYAN; O. TEMPLE SLOAN, JR.;
MEREDITH R. SPANGLER; HUGH L.
MCCOLL; ALAN T. DICKSON; FRANK
DOWD, IV; KATHLEEN F. FELDSTEIN;
C. RAY HOLMAN; W. W. JOHNSON;
RONALD TOWNSEND; SOLOMON D.
TRUJILLO; VIRGIL R. WILLIAMS;
CHARLES E. RICE; RAY C.
ANDERSON;

RITA BORNSTEIN; B. A.
BRIDGEWATER, JR.; THOMAS E.
CAPPS; ALVIN R. CARPENTER; DAVID
COULTER; THOMAS G. COUSINS;
ANDREW G. CRAIG; RUSSELL W.
MEYER, JR.; RICHARD B. PRIORY;
JOHN C. SLANE; ALBERT E. SUTER;
JOHN A. WILLIAMS; JOHN R. BELK;
TIM F. CRULL; RICHARD M.
ROSENBERG; PETER V. UEBERROTH;
SHIRLEY YOUNG; J. STEELE ALPHIN;
AMY WOODS BRINKLEY; EDWARD J.
BROWN, III; CHARLES J. COOLEY;
ALVARO G. DE MOLINA; RICHARD
M. DEMARTINI; BARBARA J.
DESOER; LIAM E. McGEE; MICHAEL
E. O'NEILL; OWEN G. SHELL, JR.;
A. MICHAEL SPENCE; R. EUGENE
TAYLOR; F. WILLIAM VANDIVER,
JR.; JACKIE M. WARD; BRADFORD
H. WARNER,

*Defendants.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:05-cv-00238-GCM)

Argued: May 17, 2012

Decided: July 25, 2012

Before AGEE, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Davis and Judge Wynn joined.

---

**COUNSEL**

**ARGUED:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, Brooklyn, New York, for Appellants. Carter Glasgow Phillips, SIDLEY AUSTIN, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Thomas D. Garlitz, THOMAS D. GARLITZ, PLLC, Charlotte, North Carolina, for Appellants. Irving M. Brenner, MCGUIREWOODS LLP, Charlotte, North Carolina; Anne E. Rea, David B. Johnson, J. Randal Wexler, Christopher K. Meyer, SIDLEY AUSTIN, LLP, Chicago, Illinois, for Appellees.

---

**OPINION**

AGEE, Circuit Judge:

David McCorkle and William Pender ("Plaintiffs") appeal the district court's order dismissing two of their class action claims against Bank of America Corp. ("the Bank") for alleged violations of certain provisions of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The gravamen of Plaintiffs' claims is that the Bank of America Pension Plan ("the Plan") employed a normal retirement age ("NRA") that violated ERISA in calculating lump sum distributions and further ran afoul of ERISA's prohibition of "backloading" in the calculation of benefit accrual. For the reasons set forth below, we agree with the district court's conclusion that Plaintiffs have failed to state a claim upon which relief may be granted, and we affirm the judgment of the district court dismissing the claims at issue.

I.

Plaintiffs and the class they represent are current and former employees of the Bank and participants in the Plan.[1] The Plan is a type of "defined benefit" plan that uses a "cash balance" formula to calculate a participant's benefit. The Seventh Circuit has provided a helpful explanation of the differences between a typical defined benefit plan and a cash balance plan like the Plan.

> The ordinary defined benefit plan entitles the employee to a pension equal to a specified percentage of his salary in the final year or years of his employment. The plan might provide for example that he was entitled to receive 1.5 percent of his final year's salary multiplied by the number of years that he had been employed by the company, so that if he had been employed for 30 years his annual pension would be 45 percent of his final salary. A cash balance plan, in contrast, entitles the employee to a pension equal to (1) a percentage of his salary every year that he is employed . . . plus (2) annual interest on the "balance" created by each yearly "contribution" of a percentage of the salary to the employee's "account," at a specified interest rate . . . . These annual increments of interest are called future interest credits.

> The reason for the scare quotes in our description of the cash balance plan is that the employee has no actual account, the employer makes no contributions to an employee account, and so there is no account

---

[1]This appeal only concerns challenges to the Plan's method of calculating NRA from its enactment in 1998 to its amendment in early 2008. As described herein (at p. 10 n.5), Plaintiffs make no claims as to Plan Years after 2007. A "Plan Year" is defined by the Plan to coincide with the calendar year. (J.A. 98).

balance to which interest might be added. In a defined contribution plan, the employee's pension entitlement is to the value of his retirement account to which contributions (whether from the employer, the employee, or both) have been made, while in a defined benefit plan, . . . the entitlement is to the pension benefit that the plan promises. The cash balance form of defined benefit plan resembles a defined contribution plan because it provides the employee with a hypothetical account balance.

*Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 757-58 (7th Cir. 2003).

Because the Plan is a defined benefit plan, participants earn what ERISA describes as an "accrued benefit," "expressed in the form of an annual benefit commencing at [NRA]." 29 U.S.C. § 1002(23). ERISA defines NRA as "the earlier of—(A) the time a plan participant attains [NRA] under the plan, or (B) the later of—(i) the time a plan participant turns age 65, or (ii) the 5th anniversary of the time a plan participant commenced participation in the plan." 29 U.S.C. § 1002(24).

For the years at issue in the case at bar, the Plan calculated NRA as "the first day of the calendar month following the earlier of (i) the date the Participant attains age sixty-five (65) or (ii) the date the Participant completes sixty (60) months of Vesting Service." (J.A. 97). In other words, a participant in the Plan attained NRA after five years of vesting service, or upon turning age 65 for participants who leave the Plan before five years or join the Plan after age sixty, whichever occurred first.

The Bank candidly admits that the definition of NRA in the Plan was designed to avoid a phenomenon known as the "whipsaw" effect.[2] In the context of a cash balance plan,

---

[2] In 2006, Congress eliminated whipsaw with the passage of the Pension Protection Act of 2006 ("PPA"), Pub. L. No. 109-280, 120 Stat. 780

whipsaw is trade shorthand for the process by which a lump sum distribution is calculated for a plan participant who departs the plan before NRA. As stated by the Internal Revenue Service ("IRS"), when an employee withdraws from a plan before NRA, "the balance of the employee's hypothetical account must be projected to [NRA] and then the employee must be paid at least the present value . . . of that projected hypothetical account balance." I.R.S. Notice 96-8, 1996-1 C.B. 359 (Feb. 5, 1996) ("Notice 96-8"). However, while the departing employee's hypothetical account balance is projected forward to NRA using the interest crediting rate specified in the plan, it is discounted back to present value using a statutorily defined formula based on the 30-year Treasury rate, a factor that fluctuates and may often be markedly lower than the plan interest crediting rate. *Id.* The result of this "whipsaw" is a potentially large disparity between the employee's current hypothetical account balance and the lump sum distribution that the employee would be entitled to receive.[3]

---

(2006), which amended ERISA to allow cash balance plans to distribute the current present value of a participant's hypothetical account upon his or her early termination from a plan. *See* PPA § 701(a)(2)(f)(1)(B) (codified at 29 U.S.C. § 1053(f)(1)(B)) ("An applicable defined benefit plan shall not be treated as failing to meet [certain accrued benefit standards] solely because the present value of the accrued benefit (or any portion thereof) of any participant is, under the terms of the plan, equal to the amount expressed as the balance in the hypothetical account . . . or as an accumulated percentage of the participant's final average compensation."); *see also West v. AK Steel Corp.*, 484 F.3d 395, 401-02 (6th Cir. 2007).

[3]Notice 96-8 itself provides an example of the whipsaw disparity:

A cash balance plan provides for interest credits at a fixed rate of 8% per annum that are not conditioned on continued employment, and for annuity conversions using the [statutorily] applicable interest rate and mortality table. A fully vested employee with a hypothetical account balance of $45,000 terminates employment at age 45 and elects an immediate single sum distribution. At the time of the employee's termination, the . . . applicable interest rate is 6.5%.

The Plan's NRA avoids the whipsaw effect by providing that plan participants reach NRA at the same time as their interests vest: five years of service with the statutorily required proviso for those hired past age 60 or who depart before five years of service.

The Bank also sought to avoid certain ERISA prohibitions on "backloading," by including particular provisions in the Plan like the NRA calculation. Pursuant to 29 U.S.C. § 1054(b)(1), a benefit plan must satisfy the "133 1/3 percent" test such that the amount a plan participant accrues in any given year is not more than 133 1/3 percent of the annual rate at which he accrued benefits the previous year. This anti-backloading provision was an effort by Congress to ensure than an employer did not "provide[ ] inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and . . . concentrate[ ] the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." *Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003) (quoting H.R. Rep. No. 93-807 (1974) *reprinted in* 1974 U.S.C.C.A.N. [4670], 4688). The prohibition against backloading, however, does not apply once an employee reaches NRA: "the earlier of age 65 or the normal retirement age specified under the plan. . . ." § 1054(b)(1)(A)(i).

The parties agree that the Plan provided relatively steady minor increases in benefits for employees who had not yet

The projected balance of the employee's hypothetical account as of normal retirement age is $209,743. If $209,743 is discounted to age 45 at 6.5% (the . . . applicable interest rate), the present value equals $59,524.

Accordingly, if the plan paid the hypothetical account balance of $45,000, instead of $59,524, the employee would receive $14,524 less than the amount to which the employee is entitled.

I.R.S. Notice 96-8.

reached NRA, and accordingly, that aspect of the Plan did not violate ERISA's anti-backloading rules. For employees who reached NRA, however, the Plan provided for more substantial increases in benefits for the employees who remained with the Bank for longer periods of time. The Plan provided that employees who had reached NRA would receive an annual "Compensation Credit" "equal to the product of the Participant's compensation for the pay period then ended multiplied by the applicable Compensation Credit Percentage . . . ." J.A. 107. The applicable Compensation Credit was determined based on "Unit Points," which were in turn the product of the employee's age plus years of service. *Id.*

Under the terms of the Plan, the Compensation Credit percentage was staggered in ten Unit Point increments. A participant with less than thirty Unit Points (the lowest tier) had a Compensation Credit percentage of 2%, while a participant with more than seventy-nine Unit Points (the highest tier) received an 8% Compensation Credit percentage—four times higher than the lowest applicable rate. J.A. 108. Plaintiffs allege that this staggered benefit increase violates the backloading prohibition, despite the fact that the staggered benefit increases do not begin until after a participant reaches NRA.

Plaintiffs filed their first complaint against the Bank in 2004 in the U.S. District Court for the Southern District of Illinois. In 2005, the action was transferred to the Western District of North Carolina, where Plaintiffs eventually filed their third amended complaint. The third amended complaint ("the Complaint") contains the relevant allegations for purposes of this appeal.

In the Complaint, Plaintiffs raise four claims: (1) unlawful lump sum benefit calculation in violation of 29 U.S.C. § 1053(a)(2) ("Count One"); (2) age discrimination ("Count Two"); (3) violation of the anti-backloading rules ("Count Three"); and (4) elimination of protected benefit ("Count Four"). The thrust of Plaintiffs' claim with respect to Counts

One and Three is that the Plan violated ERISA by failing to state a literal "age" and accordingly, the presumptive NRA under the plan was age 65. *See* J.A. 61 ("[T]he [NRA] under the Pension Plan is age 65.").

The Bank filed its amended motion to dismiss in 2009, and after lengthy briefing and oral argument, the district court issued an order granting class certification on Counts One, Three, and Four, denying the motion to dismiss as to Count Four, and granting the motion to dismiss as to Counts One and Three.[4] The court issued an Amended Order, from which the instant appeal was ultimately taken.

In the amended order, the district court, relying heavily on *Fry v. Exelon Corp. Cash Balance Pension Plan*, 571 F.3d 644 (7th Cir. 2009), concluded that the Plan's method of calculating NRA was permissible under ERISA. In *Fry*, the Seventh Circuit held that a retirement plan that calculates NRA based on five years of service (as the Plan did here) meets the definition of NRA found at § 1002(24) and accordingly does not violate ERISA. *Id.* at 647-48.

In addition to its reliance on the *Fry* decision, the district court rejected Plaintiffs' arguments that certain Treasury Department regulations and rulings demonstrated that the Plan's NRA calculation was unlawful. The court ruled that recently promulgated regulations cited by Plaintiffs were prospective in nature, and not applicable to the then-revised Plan.[5]

---

[4] Early in the course of the litigation, the district court dismissed Count Two, age discrimination, with Plaintiffs' consent. That ruling is not challenged on appeal. The Bank does not appeal the denial of the motion to dismiss with respect to Count Four.

[5] The Bank amended the Plan, effective January 1, 2008, such that a participant's "normal retirement date" was simply the date upon which "the Participant attains age 65." J.A. 231. There is no claim before us that the Plan continued to violate ERISA after the Plan was so amended. Thus, the allegations in the Complaint only concern the Plan as it was effective prior to January 1, 2008.

The court also rejected Plaintiffs' argument that the Plan's Summary Plan Description ("SPD") failed to inform plan participants that the NRA was partially based on five years of service, on the grounds that Plaintiffs failed to plead actual prejudice.

In resolving Count Three, unlawful backloading, the district court relied exclusively on a concession made at oral argument by counsel for Plaintiffs. In response to queries from the district court as to whether granting the motion to dismiss with respect to Count One would be dispositive of Count Three, Plaintiffs' counsel stated that "[o]n [C]ount [T]hree . . . I did want to say that if the [NRA] is valid on [C]ount [T]hree, we—as far as I'm aware, we do not have a theory on [C]ount [T]hree that withstands their theory of NRA validity." J.A. 252. Because the court found the Plan's NRA to be valid with respect to Count One, it summarily rejected Count Three based on counsel's concession.

Plaintiffs moved for reconsideration, arguing that the district court "overlook[ed] Plaintiffs' alternative backloading theory." Pls.' Mot. for Recons. 2, *Pender v. Bank of America Corp.*, No. 3:05-cv-00238-GCM (Sept. 10, 2010). Plaintiffs sought to argue that while Count Three "does not state a claim for post-NRA backloading," they did not concede that "merely because ERISA § 3(24) [29 U.S.C. § 1002(24)] might permit a plan to define NRA in terms of years of service, the plan will be able to use such a definition to demonstrate compliance with ERISA's benefit accrual standards." *Id.* at 3. In essence, Plaintiffs contended on reconsideration that the Plan's NRA violated ERISA substantive backloading provisions notwithstanding the court's determination that the NRA complied with the definition found at § 1002(24).

The district court denied the motion for reconsideration, noting that "Plaintiffs are attempting to change the slant of their argument in the wake of a ruling against them." J.A. 443. Nevertheless, the court considered and rejected the substan-

tive argument raised by Plaintiffs, again ruling that certain IRS notices the Plaintiffs relied upon in the motion to reconsider were prospective in nature only and did not apply to the Plan provisions at issue in the pre-2008 time period.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Bank moved for entry of final judgment.[6] The district court, finding no just reason for delay, granted the motion and entered final judgment with respect to the dismissal of Counts One and Three, and stayed further proceedings pending appeal. Plaintiffs noted a timely appeal of the judgment dismissing Counts One and Three, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

## A.

"We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

## B.

We note at the outset that Plaintiffs have abandoned their contention that the Plan's NRA is invalid under 29 U.S.C. § 1002(24) because it coincides with years of service, rather

---

[6]"Rule 54(b) permits a district court to enter final judgment as to one or more but fewer than all claims in a multiclaim action, thus allowing an appeal on fewer than all claims in a multiclaim action." *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993) (footnote omitted).

than stating an age certain. *See* Reply Br. of Plaintiffs at 5 ("Plaintiffs do not contest that the Plan's NR-date identified the 'NRA under the plan' as that term is defined in [§ 1002(24).]"). Accordingly, Plaintiffs have largely abandoned their challenge to the district court's dismissal of Count One, the claim of unlawful lump sum benefit calculation.

Plaintiffs' concession is well-counseled, as the Plan's NRA complies with ERISA. IRS guidance has long recognized that a retirement plan may specify an NRA that is below age 65. *See* Rev. Rul. 78-120, 1978-1 C.B. 117 (1978) ("In view of the definition of [NRA] found in [§ 1002(24)], and in the absence of any statutory prohibition or limitation, a plan may specify any age that is less than 65 as the [NRA]."). Indeed, the statute itself recognizes that an NRA may be "the time a plan participant attains [NRA] under the plan." § 1002(24)(A).

Furthermore, we agree with the *Fry* court that NRA need not be the same age for all participants in the plan. After parsing the language of § 1002(24), the Seventh Circuit concluded that five years of service is an "age" within the meaning of ERISA. "It is employee specific, to be sure, but 'age + 5' remains an age. It is not as if the Plan provided that 'an employee reaches [NRA] when he owns ten umbrellas.'" 571 F.3d at 647. Thus, we find persuasive that court's reasoning that

> [t]he Plan's formula not only specifies an "age" but also is lifted right out of the statute. Subsection (B)(ii) defines as the highest possible "normal retirement age" (for a person hired at 65 or older) "the 5th anniversary of the time a plan participant commenced participation in the plan." Making that statutory definition of "normal retirement age" universally applicable can't be rejected on the ground that the formula does not yield an "age." ERISA does not require the "normal retirement age"

to be the same for every employee; § 1002(24)(B)(ii) shows that too.

*Id.*

Insomuch as the Plan states a valid NRA within the meaning of § 1002(24), there is no longer any substance supporting Plaintiffs' allegation that the Plan violates ERISA by failing to engage in the project-forward, discount-back whipsaw calculation contemplated by Notice 96-8. Accordingly, all that remains of Count One is Plaintiffs' argument, discussed *infra* at Section II(E), that the Plan's SPD inaccurately described the Plan's method of benefit accrual calculation.

## C.

Although they have conceded that the Plan's NRA is valid with respect to § 1002(24), Plaintiffs maintain that the NRA nevertheless violates ERISA's anti-backloading provisions. In essence, Plaintiffs seek to argue that the NRA may be valid "definitionally," *i.e.*, under § 1002(24), but invalid as applied to ERISA's backloading rules.

Plaintiffs' abandonment of their "definitional" contention, however, is highly problematic for their ability to prevail on appeal. As the district court emphasized, Plaintiffs conceded below that their anti-backloading theory hinges on a finding that the Plan's NRA is invalid. *See* J.A. 436 ("Plaintiffs concede that Count [Three] fails if the Plan's NRA is valid; this contingency has come to pass.").

As noted *supra*, the district court was also not persuaded by Plaintiffs' attempt to "clarify" the alleged concession. "Plaintiffs are attempting to change the slant of their argument in the wake of a ruling against them." J.A. 443. Thus, Plaintiffs find themselves in the precarious position of having conceded before the district court that a valid NRA would be fatal to

their backloading claim, and conceding before this Court that the Plan's NRA is valid.

At oral argument before this Court, counsel for Plaintiffs attempted to downplay the significance of the first concession, characterizing his statement to the district court that "we do not have a theory on count three that withstands their theory of NRA validity" as merely a "stray remark." Audio Recording of Oral Argument at 2:34. Counsel further stated that the district court considered the alternative argument, and "reached the merits," thus allowing this Court to examine in turn the merits of the underlying argument notwithstanding the alleged concession.

Our review of the record in the district court, however, suggests the court was appropriately incredulous that Plaintiffs' "alternative" argument had been properly raised prior to the motion for reconsideration. Again, the district court characterized Plaintiffs' argument as a new "slant" not raised prior to reconsideration. J.A. 443. The district judge was present when counsel made the concession at issue and was clearly in the best position to determine the import of counsel's statements. We will not, on appeal, disturb the court's reasonable and supported conclusion with respect to the concession.

## D.

Plaintiffs vociferously argue, however, that they have not conceded Count III, and out of an abundance of caution, we will briefly address Plaintiffs' alternative theory that the Plan's NRA violates ERISA's backloading provisions. When we consider those claims, we find them to lack merit, especially in light of Plaintiffs' unquestionable concession that the Plan states a valid NRA pursuant to § 1002(24).

The chief failing of Plaintiffs' claim is that ERISA's backloading rules do not apply once a plan participant reaches NRA. *See* 26 U.S.C. § 411(b)(1)(B); 29 U.S.C.

§ 1054(b)(1)(B) (anti-backloading rules govern "the annual rate at which any individual who is or could be a participant can accrue the retirement benefits *payable at normal retirement age* under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.") (emphasis added); *see also Eaton v. Onan Corp.*, 117 F. Supp. 2d 812, 830 n.8 (S.D. Ind. 2000) (comparing ERISA's anti-backloading rules, which "take into account only benefits accrued before [NRA]," and anti-discrimination rules, found at Internal Revenue Code ("IRC") § 401, that "consider benefits accrued both before and after [NRA]"); 72 Fed. Reg. 28604-1, 2007-24 I.R.B. 1386 (2007) ("The definition of normal retirement age is important in applying [anti-backloading rules] because those rules are based on the benefit payable at normal retirement age."). Put another way, if the anti-backloading rules only restrict benefit accrual calculations prior to NRA, Plaintiffs cannot plausibly claim that a benefit calculation *after* NRA runs afoul of the backloading provisions of ERISA.

In an attempt to circumvent the foregoing, however, Plaintiffs cite to a 2007 IRS notice as well as a Department of the Treasury regulation which, in Plaintiffs' view, compel a holding that the Plan's NRA violates ERISA notwithstanding the concession that the NRA is valid with respect to the ERISA definition of NRA.

Plaintiffs first argue that a 2007 IRS notice, published in response to the 2007 promulgation of certain Treasury regulations,[7] discusses and rejects as unlawful the type of NRA used

---

[7]2007-24 I.R.B. 1386 (amending Treasury regulations to prospectively require that "[t]he [NRA] under a plan [must] be an age that is not earlier than the earliest age that is reasonably representative of the typical retirement age for the industry in which the covered workforce is employed."). We express no opinion on whether this amendment is a permissible construction of ERISA or the IRC.

in the Plan. Specifically, they argue that IRS Notice 2007-69, 2007-35 I.R.B. 468 (Aug. 27, 2007) ("Notice 2007-69"), entitled "Relief Related to Plan Amendment of Definition of Normal Retirement Age," constitutes the agency's authoritative position for plan years both *before* and after the Notice's publication date. Plaintiffs cite language, buried deep within a discussion of safe harbors related to the *new* regulations, that "[t]he [Internal Revenue] Service and Treasury expect that a plan under which a participant's normal retirement age changes to an earlier date upon completion of a stated number of years of service typically will not satisfy the vesting or accrual rules of [IRC] § 411." Relying on the deference due under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), Plaintiffs contend the foregoing sentence from the Notice establishes the Plan violates the Treasury regulations. We disagree.

We note first that Notice 2007-69 concerns the implications of new Treasury regulations that are prospective in nature only. The first paragraph of the Notice is clear: "[t]his notice provides temporary relief for certain pension plans whose definition of normal retirement age *may be required to be changed* to comply with the regulations regarding a plan's normal retirement age that were recently issued under section 401(a) of the [IRC]." *Id.* (emphasis added). The obvious thrust of this language is that the violations identified in the Notice are related to the newly promulgated regulations as they apply once those regulations are in effect.[8]

---

[8]Plaintiffs assert in their Opening Brief on appeal that the Notice, even if prospective only, would still have force as against the Plan as it operated from August 27, 2007 (when the Notice was published) and January 1, 2008, when the Plan was amended. Opening Br. at 45 n.5. As the Bank notes, however, and Plaintiffs do not refute, the Compensation Credit schedule was frozen during that time period, and thus there was no rate of benefit accrual increase. Consequently, there could not have been any violation of anti-backloading rules.

Plaintiffs argue, though, that the Notice's "purpose" section identifies another function: "[t]his notice also identifies potential violations of the vesting and accrued benefit requirements for defined benefit plans under [IRC] § 411 that may arise from a definition of normal retirement age based on a minimum period of service." *Id.* This "purpose," however, must be understood in the context of the notice as a whole. *Cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (when interpreting statutes, courts look at "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). Similarly, in the context of interpreting the agency's guidance, we are not to read one sentence in a vacuum.

When read in context, the language cited by Plaintiffs is simply a warning that the safe harbors described in the Notice for future plan years are not available to a plan wherein "a participant's normal retirement age changes to an earlier date upon completion of a stated number of years of service." The safe harbors, in turn, are related to the implementation of the new Treasury regulations that, the parties agree, are prospective in nature only. *See* Opening Br. at 31 ("The 2007 regulations are not at issue in this appeal."). The Notice's beginning statement, recited *supra*, and largely repeated in the "Purpose" section of the notice, confirms that the IRS was referring only to the legal status of a "changing" NRA in light of the new regulations. That is, it referred only to how a plan was to be analyzed going forward, not retroactively to plan years already passed and for which remedial efforts were not possible.[9]

Plaintiffs note, however, that Notice 2007-69 cross-

---

[9]We agree with Plaintiffs' uncontroversial statement of the law that the IRS may publish a legal interpretation of existing statutes and regulations, and that such an interpretation would be entitled to deference as to events that took place prior to the publication of the interpretation. *See* Plaintiffs' Opening Br. at 45. That is not, however, what the IRS did in Notice 2007-69.

references an older Treasury regulation: Treas. Reg. § 1.411(b)-1(b)(2)(ii)(F). The full regulation is entitled "Accrued benefit requirements," and subpart (b)(2)(ii)(F) is a "Special Rule" related to the 133 1/3 percent rule. The subpart states that

> [a] plan shall not satisfy the requirements of this subparagraph [the 133 1/3 percent rule] if the base for the computation of retirement benefits changes solely by reason of an increase in the number of years of participation. Thus, for example, a plan will not satisfy the requirements of this subparagraph if it provides a benefit, commencing at normal retirement age, of the sum of (1) 1 percent of average compensation for a participant's first 3 years of participation multiplied by his first 10 years of participation (or, if less than 10 his total years of participation) and (2) 1 percent of average compensation for a participant's 3 highest years of participation multiplied by each year of participation subsequent to the 10th year.

Treas. Reg. § 1.411(b)-1(b)(2)(ii)(F) (the "change-the-base" regulation).

Relying on the change-the-base regulation, Plaintiffs argue that the NRA employed by the Plan is, in effect, a "changing base" and is thus an unlawful attempt at backloading. The Bank makes two arguments in response. First, it posits that the NRA is not a "base" within the meaning of ERISA; and second, it contends that even if we were to consider the NRA a "base," it does not actually "change."

We find the Bank's position convincing. With respect to Plaintiffs' contention that the "earlier-of" NRA is a "base" for purposes of the backloading rules, they are unable to cite any case in which a plan's NRA has been considered a "base" within the meaning of ERISA. In fact, the authorities cited by

Plaintiffs support the Bank's theory that the NRA is not a "base."

Looking first at § 1.411(b)-1(b)(2)(ii)(F), the example described in the regulation itself is entirely unrelated to NRA. Rather, the regulation describes a plan wherein the amount by which a benefit formula is multiplied literally becomes a different amount upon completion of ten years of service. In the example, a plan participant's "base" for the first ten years is one percent of average compensation for the participant's *first three years*, and the "base" for each year after ten years of participation is one percent of average compensation for the participant's *highest three years*.

Similarly, *Carollo v. Cement and Concrete Workers District Council Pension Plan*, 964 F. Supp. 677 (E.D.N.Y. 1997), cited by Plaintiffs, is inapposite. In that case, the plan at issue operated as follows:

> [f]or the first 24 years of service . . . a participant's pension benefit accrues at 2% of Average Monthly Earnings, that is, a participant's career average pay (Average Earnings). Participants who work for 25 years without a break in service longer than two years, will, in their 25th year, have their pension benefit recalculated for all previous years of service at 2% of Final Average Monthly Earnings (Final Average Earnings). Final Average Earnings is the average pay based not on the career average pay but on a participant's highest five years of earnings in the ten years prior to retirement (Final Average Earnings). For each year of employment after such a participant's 25th year, the benefit accrues at 1.66% of Final Average Earnings.

*Id.* at 682. The *Carollo* court found that the plan violated the change the base regulation by, not only increasing a partici-

pant's benefit base after 25 years, but making that change retroactive for the participant's entire career. *Id.* at 683.

In both the above examples, the plan provided for a change in the amount upon which benefits were to be calculated—literally the base. *See, e.g.*, *id.* at 682 ("The percentage is considered the 'rate'; the average monthly pay constitutes the 'base.'"). Although Plaintiffs assert that the NRA should also be considered part of the "base" for purposes of the change-the-base regulation, they have come forward with no authority, and we can find none, in support of that position. Rather, the weight of authority supports the Bank's stance that "base" means just that: the amount of compensation that, when multiplied by the benefit computation formula, becomes the benefit payable under the plan.

Furthermore, the Bank persuasively argues that, even indulging in the assumption that NRA is part of the "base," the Plan's NRA does not change within the meaning of the change-the-base regulation. It contends that the NRA changes only if one assumes, improperly, that a Plan participant does not work beyond the current year.

Under the theory pressed by Plaintiffs, when an employee joins the Plan, his or her NRA begins as age 65. By that same theory, when an employee has completed five years of service, the employee's NRA then changes to that employee's age at that point in time. This interpretation of the Plan, however, wrongly assumes that the participant will reach age 65 before reaching five years of service. *See* Opening Br. at 19 ("[E]very employee starts out with a [NRA] of 'age 65' – i.e., the earlier of the two alternative dates in the definition that the employee would reach were he to immediately terminate employment.").

The flaw in Plaintiffs' reasoning is their assumption that the NRA calculation must be made as though the employee was immediately terminating employment the day after he or

she starts. Plaintiffs do not offer any support for that assumption, which the anti-backloading statute itself, 29 U.S.C. § 1054, dispels. The statute plainly provides that "all . . . relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after [such] current year." § 1054(b)(1)(B)(iv). In other words, a participant's employment is "treated as remaining constant" for the year of his initial employment and "for all years after the current year." *Id.* Thus, ERISA would assume the participant's employment continues until actual termination causes a change and would not indulge an artificial assumption the employee would move on within five years of starting.

When employment is viewed as a constant, Plaintiffs' theory that the NRA *changes* after five years of service falls apart. Viewing employment as a constant, as 29 U.S.C. § 1054 says we should, an individual who becomes a Plan participant (before age 60) will reach NRA upon five years of vesting service. Because the Plan does not use an NRA that changes after five years of service, neither 26 C.F.R. § 1.411(b)-1(b)(2)(ii)(F) nor Notice 2007-69 are inapplicable. Accordingly, even if Plaintiffs had not conceded Count Three fails to state a claim, Plaintiffs have not carried their burden to show that the Plan impermissibly backloads benefit accrual.

## E.

Finally, we briefly address the claims raised by Plaintiffs with respect to the Plan's SPD. In the district court, Plaintiffs argued that the SPD affirmatively misled participants by describing an NRA different from that actually utilized by the Plan. In this Court, for the first time, Plaintiffs argue that the amendment to the Plan adopting the NRA at issue "provide[d] for a significant reduction in the rate of future benefit accrual" and accordingly, required specific disclosures pursuant to 29 U.S.C. § 1054(h). Opening Br. at 55. Inasmuch as Plaintiffs failed to raise the latter claim before the district court, we will

not address it here. *See First Va. Banks, Inc. v. BP Exploration & Oil, Inc.*, 206 F.3d 404, 407 n.1 (4th Cir. 2000) ("Because neither of these arguments were raised below, we decline to consider them on appeal.").

Moreover, with respect to the former claim, we do not agree with Plaintiffs' contention that the SPD failed to inform Plan participants of the manner in which their benefits are calculated.

"In the Fourth Circuit, if there is a conflict between the complexities of the plan's language and the simple language of the SPD, the latter will control if the participant relied on the SPD or was prejudiced by it." *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1204 (4th Cir. 1997) (quoting *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 511 (4th Cir. 1994) (internal quotation marks and alterations omitted). Plaintiffs have adequately pled neither reliance nor prejudice, but argue that the requirement that they so plead has been abrogated by *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), and accordingly, that the district court's holding with respect to this claim was erroneous.

It is elementary, however, that "we are entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below." *Everett v. Pitt Cnty. Bd. of Educ.*, 678 F.3d 281, 291 (4th Cir. 2012) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 643 n.10 (4th Cir. 2011)) (internal quotation marks omitted). Put simply, Plaintiffs have failed to show that the SPD's language differs from the terms of the Plan. Rather, the SPD provided by the Bank clearly sets forth the Plan's vesting and benefit eligibility standards. *See, e.g.*, 2000 Employee Handbook 112, *Pender v. Bank of America Corp.*, No. 3:05-cv-00238-GCM (Feb. 16, 2010) ("Vesting means you have the right to receive your Pension Plan benefits when your employment ends. Your Pension Plan account is 100% vested after you complete five years (60 months) of vesting service or attain age 65 . . . .").

Plaintiffs have come forth with no authority requiring the SPD to use terms of art, such as NRA, in describing benefit accrual. To the contrary, ERISA's implementing regulations clearly require an SPD to "be written in a manner calculated to be understood by the average plan participant[.]" 29 C.F.R. § 2520.102-2(a). Accordingly, the SPD should usually "limit[ ] or eliminat[e] . . . technical jargon[.]" *Id.* With that standard in mind, and reviewing the SPDs contained in the district court's docket, we readily conclude that there is no conflict between the SPD and the Plan, and accordingly, we need not address the merits of Plaintiffs' claim that *Amara* requires a remand.

## III.

Because we agree with the district court that Plaintiffs have failed to state a claim upon which relief may be granted with respect to either benefit accrual under Count One or backloading under Count Three, we affirm the district court's judgment.

*AFFIRMED*