**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: TOTAL REALTY
MANAGEMENT, LLC,

*Debtor.*

---

BRYAN S. ROSS, Chapter 7 Trustee
for Total Realty Management,
LLC,

*Plaintiff-Appellant,*

v.

R.A. NORTH DEVELOPMENT,
INCORPORATED; R. A. NORTH
DEVELOPMENT I, INCORPORATED;
SOUTHEASTERN WATERFRONT
MARKETING, INCORPORATED;
SOUTHEASTERN WATERWAY SALES,
INCORPORATED; WATERFRONT
DEVELOPMENT SERVICES,
INCORPORATED; WATERFRONT
COMMUNITIES, INCORPORATED;
SOUTHEASTERN LAND SALES
INCORPORATED,

*Defendants-Appellees,*

and

UNITED STATES BANKRUPTCY COURT,
Alexandria,

*Party-in-Interest.*

No. 11-2101

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:11-cv-00684-GBL-JFA; 09-11939-RGM)

Argued: October 25, 2012

Decided: January 14, 2013

Before SHEDD, DAVIS, and WYNN, Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Shedd and Judge Davis joined.

---

**COUNSEL**

**ARGUED:** John Connell Altmiller, Jr., PESNER KAWA-MOTO CONWAY, PLC, McLean, Virginia, for Appellant. Michael Wayne Robinson, VENABLE, LLP, Vienna, Virginia, for Appellees. **ON BRIEF:** William D. Dolan, III, VENABLE, LLP, Vienna, Virginia, for Appellees.

---

**OPINION**

WYNN, Circuit Judge:

The bankruptcy trustee (the "Trustee") for debtor Total Realty Management, LLC ("TRM") appeals the dismissal of his adversary action against real estate development companies R.A. North Development, Inc. and R.A. North Development I, Inc., and several of their sales and marketing affiliates (collectively, "R.A. North").[1] The Trustee alleges that TRM

---

[1]The Trustee's complaint identifies five sales and marketing affiliates of R.A. North Development and R.A. North Development I: Waterfront

and R.A. North jointly engaged in a scheme to sell properties at inflated prices in recently developed subdivisions in North Carolina and South Carolina. The Trustee seeks contribution from R.A. North for TRM's liabilities under the Interstate Land Sales Full Disclosure Act ("Interstate Land Sales Act"), which prohibits developers from making fraudulent and misleading statements to purchasers in the course of real estate transactions. But TRM is not entitled to contribution as a matter of law because it has yet to make any payment to aggrieved purchasers stemming from Interstate Land Sales Act violations. Consequently, we affirm.

## I.

### A.

According to the Trustee, during 2006 and 2007, TRM and R.A. North engaged in a real estate fraud scheme. R.A. North Development developed the Cannonsgate subdivision in Carteret County, North Carolina, and R.A. North Development I developed the Summerhouse subdivision in Onslow County, North Carolina. Maryville Partners, Inc. ("Maryville"), which is not a party to this appeal, developed the Craven's Grant subdivision in Georgetown County, South Carolina. Maryville contracted with R.A. North to assist in the marketing and sales of Craven's Grant properties.

Under the scheme, TRM purchased a number of Cannonsgate, Summerhouse, and Craven's Grant parcels from R.A. North and Maryville at fair-market value. Within hours of purchase, TRM resold the parcels to individual purchasers at

Development, Inc.; Waterfront Communities, Inc.; Southeastern Waterfront Marketing, Inc.; Southeastern Land Sales, Inc.; and Southeastern Waterway Sales, Inc. R.A. North Development, R.A. North Development I, and the five sales and marketing affiliates are all controlled by brothers Randolph M. Allen and William G. Allen. For simplicity, we refer to these entities collectively as R.A. North.

a substantial premium—and substantially above fair-market value. TRM then used the proceeds from the sales to finance its earlier-in-the-day purchases from R.A. North and Maryville.

TRM attracted buyers by holding seminars for would-be real estate investors. Sales and marketing affiliates of R.A. North provided electronic and hard-copy marketing materials to TRM to distribute at the seminars and videos to post on its website. During the seminars, TRM employees and agents of R.A. North would give presentations regarding the investment potential of the three subdivisions, including testimonials from investors who had previously made money through purchasing and reselling lots in the subdivisions. At the seminars, TRM falsely represented to prospective buyers that it owned the lots it was selling and that it purchased the lots at a bulk discount from R.A. North. R.A. North was aware that TRM made these false representations at the time they were made. Sales affiliates of R.A. North also assisted TRM's Summerhouse purchasers in obtaining financing by telling lenders that TRM had agreed to buy nearly all of the parcels in the subdivision.

Richard M. Watts—who served as sales manager for the subdivisions and was compensated by Southeastern Waterfront Marketing, a sales and marketing unit of R.A. North—participated in TRM's scheme. In particular, at TRM's seminars, Watts showed videos and made presentations about the subdivisions, and he informed purchasers that Southeastern Waterfront Marketing would assist them in reselling their lots. Watts told purchasers that Southeastern Waterfront Marketing would charge a 10% brokerage fee for assisting in resales, making purchasers more likely to buy from TRM because it only charged a 6% brokerage fee for resales. Watts also interacted with TRM representatives on a regular basis to promote sales of lots in the three subdivisions.

The Trustee contends that R.A. North benefited from this scheme in at least three ways: (1) TRM's aggressive sales tac-

tics allowed R.A. North to exhaust its inventory more quickly, freeing it from blanket mortgages on the subdivisions that could not be released until a certain percentage of lots were sold; (2) the premium prices paid by TRM's purchasers made R.A. North's prospective direct purchasers more likely to buy lots because R.A. North's prices appeared to be below market value; and (3) the scheme allowed R.A. North to tout to its direct purchasers the possibility of reselling their lots to TRM's customers, who were paying inflated prices.

B.

This case's procedural background is somewhat circuitous. One group of aggrieved purchasers brought actions under the Interstate Land Sales Act against TRM and R.A. North in the United States District Court for the Eastern District of Virginia. *See Beth A. Feeley v. Total Realty Management*, No. 1:08-cv-1212 (E.D. Va. filed Nov. 20, 2008). That group of aggrieved purchasers put TRM into involuntary bankruptcy in 2009. R.A. North reached a settlement with all but six of the *Feeley* plaintiffs. A separate group of purchasers filed suit in the Circuit Court of Prince William County, Virginia, asserting essentially the same claims against R.A. North and other defendants. *See Christina Blake v. Michael McCracken*, No. CL0900489800 (Va. Cir. Ct. 2009). The circuit court dismissed the complaint without leave to amend on the basis that the plaintiffs could not pursue claims against R.A. North under the Interstate Land Sales Act, either directly or via an agency theory.

This appeal arises from an adversary proceeding brought by the Trustee for TRM against R.A. North on April 19, 2011, in the U.S. Bankruptcy Court for the Eastern District of Virginia. The action sought statutory contribution from R.A. North related to TRM's alleged liability to aggrieved buyers under Interstate Land Sales Act provisions that allow for rescission of violative sales (Counts I-VII) and damages stemming from fraudulent and misleading actions taken in the

course of covered real estate transactions (Counts VIII-XIV). The allegations in the Trustee's action are substantially similar to the allegations in *Feeley* and *Blake*.

R.A. North successfully moved to withdraw and transfer the Trustee's action from the bankruptcy court to the United States District Court for the Eastern District of Virginia. Thereafter, R.A. North moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted R.A. North's motion on all claims, concluding that: the statutory contribution claims failed as a matter of law because R.A. North would not have been liable if sued separately; the complaint failed to allege with sufficient particularity that TRM acted as R.A. North's agent; and R.A. North could not be sued separately as an agent under the Interstate Land Sales Act. The Trustee appealed.

## II.

We review a district court's dismissal of an action under Rule 12(b)(6) de novo. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 230 (4th Cir. 2004). We also review questions of statutory construction de novo. *In re Sunterra Corp.*, 361 F.3d 257, 263 (4th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *McCorkle v. Bank of America Corp.*, 688 F.3d 164, 171 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation omitted). This Court may affirm a district court's dismissal of a complaint under Rule 12(b)(6) "on any basis fairly supported by the record." *Am. Chiropractic*, 367 F.3d at 232-33 (quotation omitted).

On appeal, the Trustee challenges the district court's decision regarding the damages claims, but not the rescission claims. The Trustee argues that the district court failed to directly address its damages claims, incorrectly determined

that TRM's purchasers had no recourse against R.A. North under the Interstate Land Sales Act as a matter of law, and erred in holding that the complaint failed to satisfy the federal pleading standards.

The Interstate Land Sales Act provides that "[e]very person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment." 15 U.S.C. § 1709(d). Therefore, to state a claim for contribution under the Interstate Land Sales Act, a complaint must allege that (1) the plaintiff has "become[ ] liable" under the statute, (2) the defendant is independently liable for the same conduct, and (3) the plaintiff is entitled to "contribution" from the defendant. *Id.*

Following the district court's approach, we will begin by assuming, without deciding, that TRM is liable to purchasers of properties in the subdivisions. Thus, to state a claim for statutory contribution, the Trustee's complaint must establish both that R.A. North is independently liable under the Interstate Land Sales Act to TRM's purchasers and that TRM is entitled to contribution from R.A. North.

A.

The Trustee contends that R.A. North is independently liable to TRM's purchasers under the Interstate Land Sales Act's provision barring developers from engaging in fraudulent or deceitful acts in the course of covered real estate transactions. In particular, Section 1703 makes it "unlawful for any developer . . . directly or indirectly . . . with respect to the sale or lease, or offer to sell or lease . . . to employ any device, scheme, or artifice to defraud [or] to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser . . . ." 15 U.S.C. § 1703(a)(2)(A), (a)(2)(C); *see also* 15 U.S.C. § 1709(a) (allowing purchasers to bring damages actions for sales made

in violation of Section 1703(a)). The statute broadly defines "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. § 1701(5).

The Trustee asserts that R.A. North is individually liable for TRM's sales because R.A. North participated in the sales and marketing efforts for the properties at issue. By contrast, R.A. North contends that even if it participated in TRM's sales and marketing efforts, it cannot be liable because TRM's purchasers "must look to the developer from whom [they] purchased the lot." Appellee's Br. at 17. In particular, R.A. North maintains that such a limitation conforms to the Interstate Land Sales Act's definition of "developer" and requirement that a defendant's fraudulent action be made "with respect to [a] sale." *Id.*

This Court has not had occasion to address whether liability under the Interstate Land Sales Act extends to entities that were not party to a challenged real estate transaction but engaged in fraudulent advertising or marketing activities in the course of that transaction. However, we have said that the language of the Interstate Land Sales Act should "be read broadly to effectuate" its goal of "protect[ing] purchasers of land which is part of a common promotional scheme." *Olsen v. Lake Country, Inc.*, 955 F.2d 203, 205 (4th Cir. 1991) (per curiam).

When interpreting a statute, we begin with the plain language. *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011). In doing so, "we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import." *Id.* (internal quotation omitted). To determine a statute's plain meaning, we not only look to the language itself, but also "the specific context in which that language is used, and the broader context of the statute as a whole." *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th Cir. 1999) (quotation omitted).

Principles of statutory construction require "a court to construe all parts to have meaning" and, accordingly, avoid constructions that would reduce some terms to mere surplussage. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004). Canons of construction also require that, to the extent possible, identical terms or phrases used in different parts of the same statute be interpreted as having the same meaning. *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011). This "presumption of consistent usage . . . ensure[s] that the statutory scheme is coherent and consistent." *Id.* (quotation omitted).

To determine whether R.A. North is potentially liable to TRM's purchasers, we first look to the definition of "developer" under the Interstate Land Sales Act. Here, the definition of developer encompasses entities that "sell[ ] . . . *or* advertise[ ] for sale" properties in covered subdivisions. 15 U.S.C. § 1701(5) (emphasis added). Expressly including advertising as a basis for treating an entity as a "developer" indicates that Congress intended to extend the Interstate Land Sales Act liability beyond just those entities that sell properties. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . .").

Nevertheless, R.A. North maintains liability is limited to the party that sold the property to the buyer bringing suit because Section 1703(a)(2) only covers fraudulent acts taken by a developer "with respect to [a] sale." Appellee's Br. at 17. However, when one compares Section 1703(a)(2) with the Interstate Land Sales Act's preceding clause, 15 U.S.C. § 1703(a)(1), which deals with disclosure requirements, it is readily apparent that the language of the statute does not support such a limitation. Section 1703(a)(1) provides:

> It shall be unlawful for any developer . . . directly or indirectly . . . with respect to the sale or lease of any lot . . .

(A) *to sell* or lease any lot unless a statement of record with respect to such lot is in effect . . . ;

(B) *to sell* or lease any lot unless a printed property report . . . has been furnished to the purchaser . . . in advance of the signing of any contract or agreement . . . ;

(C) *to sell* or lease any lot where any part of the statement of record or the property report contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein . . . ; or

(D) *to display or deliver* to prospective purchasers . . . advertising or promotional material which is inconsistent with information required to be disclosed in the property report . . . .

15 U.S.C. § 1703(a)(1) (emphasis added). By using the term "to sell" in Sections 1703(a)(1)(A)-(C), Congress limited liability under those clauses to the sellers of property. This is particularly apparent when Sections 1703(a)(1)(A)-(C) are compared to Section 1703(a)(1)(D), which deals with advertising and promotion and prohibits "display[ing] or deliver-[ing]" rather than "sell[ing]," indicating that Congress intended to hold advertisers and promoters liable for certain acts, even if they did not sell a property. Were we to construe the phrase "with respect to the sale" in Section 1703(a)(1) as limiting liability to sellers, we would render the term "to sell" in Sections 1703(a)(1)(A)-(C) meaningless. Principles of statutory construction require that we reject such an interpretation. *See PSINet*, 362 F.3d at 232. A better reading of the phrase "with respect to the sale," which gives meaning to all of the terms in the statute, is that the phrase is intended to limit liability to claims stemming from prohibited actions taken in relation to consummated sales.

Therefore, since the phrase "with respect to the sale" in Section 1703(a)(1) cannot reasonably be interpreted as limiting liability to sellers, we should not interpret the identical phrase in Section 1703(a)(2) as requiring such a limitation. *See Healthkeepers*, 642 F.3d at 472. The fact that Congress effectively distinguished in Section 1703(a)(1) between conduct for which only sellers would be liable and conduct for which all developers would be liable only reinforces this interpretation. Had Congress wanted to limit liability under Section 1703(a)(2) to sellers it simply could have used the same limiting language it used in Sections 1703(a)(1)(A)-(C).

Furthermore, the legislative history of the statute does not support limiting liability under Section 1703(a)(2) to sellers. The Interstate Land Sales Act was enacted in 1968 during the rapid expansion of the interstate land sales industry and in response to a number of high-profile cases of misleading and fraudulent marketing and sales of properties to out-of-state buyers, particularly retirees. *See* 113 Cong. Rec. S315 (daily ed. Jan. 12, 1967) (statement of Sen. Williams). In introducing the bill, Senator Williams noted that the bill was intended to broadly address the "promotion" of land sales across state lines because out-of-state buyers generally rely on "what they are told in advertising, telephone conversations, 'sales parties,' and by salesmen . . . " *id.*, indicating that Congress was just as concerned with the promotion and advertising of properties as it was with the selling of properties.

Additionally, we observe that though we have not addressed this issue, our district courts have found that parties can be held liable under the Interstate Land Sales Act as "developers" if they are engaged in the sales and marketing of a development, even if they are not the sellers. For example, in *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731 (E.D. Va. 2010), the Eastern District of Virginia found that Ritz-Carlton could be held liable as a "developer" under the Interstate Land Sales Act when it leant its name to a development's marketing materials and participated in marketing

efforts, despite the fact that the plaintiff-buyer did not pur-
chase the property from Ritz-Carlton. *Id.* at 746-47. Similarly,
in *Hammar v. Cost Control Marketing & Sales Management
of Virginia*, 757 F. Supp. 698 (W.D. Va. 1990), the Western
District of Virginia held that a bank could be held liable as a
"developer" under the Interstate Land Sales Act, even though
it had not sold the properties at issue, explaining that "[w]hen
a financial institution allows its name to be used in advertise-
ments or announcements for a development, it is in effect
lending its prestige and good name to the sales effort." *Id.* at
702-03.

Given the Interstate Land Sales Act's plain language, Con-
gress's intent to address fraudulent promotion in enacting the
statute, and our precedent stating that the Interstate Land
Sales Act should be read broadly, we agree with the district
courts and hold that the Interstate Land Sales Act's fraud pro-
vision encompasses entities that participated in the advertising
and promotional efforts leading to a challenged real estate
transaction, even if they ultimately were not party to the trans-
action. The Trustee's complaint alleges that R.A. North repre-
sentatives spoke at TRM's sales seminars for the subdivisions
and that R.A. North marketing materials were widely dissemi-
nated at those seminars and on TRM's website. These allega-
tions are sufficient to establish that R.A. North is potentially
liable to TRM's purchasers under the Interstate Land Sales
Act's antifraud provisions.[2]

B.

Having determined that R.A. North is potentially liable, as
a matter of law, for any fraudulent acts it took in the course

---

[2]The Trustee also contends that R.A. North is a "developer" under the
Interstate Land Sales Act as an "indirect seller" of the properties sold by
TRM. Appellant's Br. at 13. Because we hold that R.A. North is poten-
tially liable for assisting TRM with advertising and sales, we need not, and
therefore do not, determine whether R.A. North was an "indirect seller."

of advertising and promoting TRM's sales, we further must determine whether TRM is entitled to statutory contribution from R.A. North. As noted previously, the Interstate Land Sales Act provides that "[e]very person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment." 15 U.S.C. § 1709(d).

R.A. North contends that the Trustee's complaint fails to plead a claim for contribution because it does not allege that TRM has made any payment related to its Interstate Land Sales Act liability—a necessary element for a contribution claim at common law. By contrast, the Trustee argues that because the right to contribution under the Interstate Land Sales Act is created by statute, the plain language of the statute controls, rather than the common law understanding of contribution. Since the statute allows for contribution when a party "becomes liable," the Trustee contends payment by the party seeking contribution is not a precondition of recovery. Appellant's R. Br. at 4-5.

As always, we begin by looking at the statute's plain language. *Crespo*, 631 F.3d at 133. In doing so, we consider not only the language at issue but also the language's context in the statute as a whole. *Holland*, 181 F.3d at 603. In construing a statute, to the extent possible, we seek to give meaning to every word and "reject constructions that render a term redundant." *PSINet*, 362 F.3d at 232. If the plain language is unambiguous, we need look no further. *Holland*, 181 F.3d at 603. However, "[i]f the statutory language is ambiguous, we look beyond the language of the statute to the legislative history for guidance." *Id.* (internal quotation omitted).

Here, despite the Trustee's contention, the language of the Interstate Land Sales Act's contribution clause is at least ambiguous as to whether payment is required before a party may bring an independent action for contribution. While the

use of the phrase "becomes liable" suggests that the right to contribution may arise with liability rather than payment, the phrase must be read in the context of the entire contribution clause, which also provides that a party "may recover contribution as in cases of contract." 15 U.S.C. § 1709(d). At common law, a party can bring a claim for contribution against a jointly liable party only if the party bringing the claim has already paid more than its share of liability. Restatement (Second) of Torts § 886A(2) (1979); *see also* 18 Am. Jur. 2d, Contribution § 11 (2004) ("The right to contribution is inchoate or subordinate from the time of the creation of the relationship giving rise to the common burden until the time of payment by a co-obligor of more than his or her proportional share."). The Trustee asserts that limiting the scope of the Interstate Land Sales Act's contribution clause to cases where a joint obligor has already paid more than its share of liability would effectively render the term "becomes liable" redundant. However, were we to adopt the Trustee's reading, we would violate the same principle by failing to give "contribution" its common meaning. In light of this conflict, the plain language of the statute is ambiguous.

Given this ambiguity, we next turn to the legislative history. Congress intended to pattern the Interstate Land Sales Act after the Securities Act of 1933 (the "1933 Act"). *See* 113 Cong. Rec. S316 (daily ed. Jan. 12, 1967) (statement of Sen. Williams) (noting that the Interstate Land Sales Act "is based on the full disclosure principle established in the Securities Act of 1933"). In fact, much of the Interstate Land Sales Act's language "parallels" provisions in the 1933 Act. *Id.*; *see also Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 778 (1976) ("[The Interstate Land Sales Act] is based on the full disclosure provisions and philosophy of the Securities Act of 1933 . . . which it resembles in many respects.").

While federal courts have not interpreted the Interstate Land Sales Act's contribution clause, the language in Section 1709(d) is virtually identical, in pertinent part, to the contribu-

tion clauses in the 1933 Act, 15 U.S.C. § 77k(f),[3] and the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78i(f)[4] & 78r(b),[5] which frequently have been construed by federal courts. Courts interpreting the contribution language in the Securities Acts consistently have found that payment by a potentially liable party is a precondition to that party seeking contribution from a jointly liable party. *See, e.g.*, *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 295-96 (9th Cir. 1996); *Employers Ins. of Wausau v. Musick, Peeler & Garret*, 954 F.2d 575, 578-79 (9th Cir. 1992) (holding that when contribution is brought as a separate cause of action, rather than through third-party practice, the plaintiff/joint-tortfeasor must allege that it has paid more than its fair share of the liability), aff'd on other grounds, *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993); *Heizer Corp. v. Ross*, 601 F.2d 330, 335-36 (7th Cir. 1979); *In re Cendant Corp. Deriv. Action Lit.*, 96 F. Supp. 2d 394, 398 (D. N.J. 2000) (explaining that contribution is an "inchoate right" until a party has made payment); *Wassel v. Eglowsky*, 399 F. Supp. 1330, 1370-71 (D. Md. 1975), adopted by *Wassel v. Eglowsky*, 542 F.2d 1235 (4th Cir. 1976), abrogation on other grounds recognized by *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir. 1989).

---

[3]Section 77k(f) of the 1933 Act provides: "[E]very person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment . . . ."

[4]Section 78i(f) of the 1934 Act provides: "Every person who becomes liable to make any payment under this subsection may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment."

[5]Section 78r(b) of the 1934 Act provides: "Every person who becomes liable to make payment under this section may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment."

Based on the foregoing interpretations of identical language and Congress's intent to draw on precedent from the Securities Acts in drafting the Interstate Land Sales Act, we hold that a party liable under the Interstate Land Sales Act is not entitled to seek contribution as an independent cause of action[6] until it has made payment to injured parties pursuant to that liability. Because the Trustee's complaint does not allege that TRM has made any payments to purchasers stemming from its potential Interstate Land Sales Act liability, it fails as a matter of law.[7]

## III.

In sum, R.A. North is potentially independently liable to TRM's purchasers because it participated in TRM's sales and marketing efforts. But, because TRM is not entitled to statutory contribution, the Trustee's action fails as a matter of law. Consequently, we affirm.

*AFFIRMED*

---

[6]We take no position on whether an Interstate Land Sales Act defendant may bring a claim against a potentially jointly liable party under Federal Rule of Civil Procedure 14(a) when the defendant has not yet paid more than its share of liability under the Interstate Land Sales Act to the plaintiff.

[7]Because the Trustee is not entitled to seek contribution from R.A. North, we need not reach R.A. North's alternative claims that it is entitled to a contribution set-off based upon language in its settlement agreement in the *Feeley* action and that the Trustee's complaint is insufficient under federal pleading standards.