*730 NIEMEYER, Circuit Judge,
concurring in part and dissenting in part:
I concur in Part IV of the court’s opinion. With respect to whether G.G. stated a claim under Title IX and whether the district court abused its discretion in denying G.G’s motion for a preliminary injunction, I would affirm the ruling of the district court dismissing G.G.’s Title IX claim and denying his motion for a preliminary injunction. I therefore dissent from the majority’s decision on those issues.
G.G., a transgender boy who is 16, challenges as discriminatory, under the Equal Protection Clause and Title IX of the Education Amendments of 1972, his high school’s policy for assigning students to restrooms and locker rooms based on biological sex. The school’s policy provides: (1) that the girls’ restrooms and locker rooms are designated for use by students who are biologically female; (2) that the boys’ restrooms and locker rooms are designated for use by students who are biologically male; and (3) that all students, regardless of their sex, are authorized to use the school’s three single-stall unisex restrooms, which the school created to accommodate transgender students. Under this policy, G.G., who is biologically female but who identifies as male, is authorized to use the girls’ restrooms and locker rooms and the unisex restrooms. He contends, however, that the policy discriminates against him because it denies him, as one who identifies as male, the use of the boys’ restrooms, and he seeks an injunction compelling the high school to allow him to use the boys’ restrooms.
■ The district court dismissed G.G.’s Title IX claim, explaining that the school complied with Title IX and its regulations, which permit schools to provide separate living facilities, restrooms, locker rooms, and shower facilities “on the basis of sex,” so long as the facilities are “comparable.” 20 U.S.C. § 1686; 34 C.F.R. §§ 106.32(b), 106.33.
Strikingly, the majority now reverses the district court’s ruling, without any supporting case law, and concludes that when Title IX and its regulations provide for separate living facilities, restrooms, locker rooms, and shower facilities on the basis of sex, the statute’s and regulations’ use of the term “sex” means a person’s gender identity, not the person’s biological status as male or female. To accomplish its goal, the majority relies entirely on a 2015 letter sent by the Department of Education’s Office for Civil Rights to G.G., in which the Office for Civil Rights stated, “When a school elects to separate or treat students differently on the basis of sex [when providing restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes], a school generally must treat transgender students consistent with their gender identity.” (Emphasis added). Accepting that new definition of the statutory term “sex,” the majority’s opinion, for the first time ever, holds that a public high school may not provide separate restrooms and locker rooms on the basis of biological sex. Rather, it must now allow a biological male student who identifies as female to use the girls’ restrooms and locker rooms and, likewise, must allow a biological female student who identifies as male to use the boys’ restrooms and locker rooms. This holding completely tramples on all universally accepted protections of privacy and safety that are based on the anatomical differences between the sexes. And, unwittingly, it also tramples on the very concerns expressed by G.G., who said that he should not be forced to go to the girls’ restrooms because of the “severe psychological distress” it would inflict on him and because female students had “reacted negatively” to his presence in girls’ restrooms. Surely biological males who identify as females would encounter simi *731 lar reactions in the girls’ restroom, just as students physically exposed to students of the opposite biological sex would be likely to experience psychological distress. As a result, schools would no longer be able to protect physiological privacy as between students of the opposite biological sex.
This unprecedented holding overrules custom, culture, and the very demands inherent in human nature for privacy and safety, which the separation of such facilities is designed to protect. More particularly, it also misconstrues the clear language of Title IX and its regulations. And finally, it reaches an unworkable and illogical result.
The recent Office for Civil Rights letter, moreover, which is not law but which is the only authority on which the majority relies, states more than the majority acknowledges. In the sentence following the sentence on which the majority relies, the letter states that, to accommodate transgender students, schools are encouraged “to offer the use of gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities [as permitted by Title IX’s regulations].” This appears to approve the course that G.G.’s school followed when it created unisex restrooms in addition to the boys’ and girls’ restrooms it already had.
Title IX and its implementing regulations are not ambiguous. In recognition of physiological privacy and safety concerns, they allow schools to provide “separate living facilities for the different sexes,” 20 U.S.C. § 1686, provided that the facilities are “proportionate” and “comparable,” 34 C.F.R. § 106.32(b), and to provide “separate toilet, locker room, and shower facilities on the basis of sex,” again provided that the facilities are “comparable,” 34 C.F.R. § 106.33. Because the school’s policy that G.G. challenges in this action comports with Title IX and its regulations, I would affirm the district court’s dismissal of G.G.’s Title IX claim.
I
The relevant facts are not in dispute. G.G. is a 16 year-old who attends Gloucester High School in Gloucester County, Virginia. He is biologically female, but “did not feel like a girl” from an early age. Still, he enrolled at Gloucester High School for his freshman year as a female.
During his freshman year, however, G.G. told his parents that he considered himself to be transgender, and shortly thereafter, at his request, he began therapy with a psychologist, who diagnosed him with gender dysphoria, a condition of distress brought about by the incongruence of one’s biological sex and gender identity.
In August 2014, before beginning his sophomore year, G.G. and his mother met with the principal and guidance counselor at Gloucester High School to discuss his need, as part of his treatment, to socially transition at school. The school accommodated all of his requests. Officials changed school records to reflect G.G.’s new male name; the guidance counselor supported G.G.’s sending an email to teachers explaining that he was to be addressed using his new name and to be referred to using male pronouns; G.G. was permitted to fulfill his physical education requirement through a home-bound program, as he preferred not to use the school’s locker rooms; and the school allowed G.G. to use a restroom in the nurse’s office “because [he] was unsure how other students would react to [his] transition.” G.G. was grateful for the school’s “welcoming environment.” As he stated, “no teachers, administrators, or staff at Gloucester High School expressed any resistance to calling [him] by [his] legal name or referring to [him] using male pronouns.” And he was “pleased to discover *732 that [his] teachers and the vast majority of [his] peers respected the fact that [he is] a ■boy.”
As the school year began, however, G.G. found it “stigmatizing” to continue using the nurse’s restroom, and he requested to use the boys’ restrooms. The principal also accommodated this request. But the very next day, the School Board began receiving “numerous complaints from parents and students about [G.G.’s] use of the boys’ restrooms.” The School Board thus faced a dilemma. It recognized G.G.’s feelings, as he expressed them, that “[u]sing the girls’ restroom[s][was] not possible” because of the “severe psychological distress” it would inflict on him and because female students had previously “reacted negatively” to his presence in the girls’ restrooms. It now also had to recognize that boys had similar feelings caused by G.G.’s use of the boys’ restrooms, although G.G. stated that he continued using the boys’ restrooms for some seven weeks without personally receiving complaints from fellow students.
The Gloucester County School Board considered the problem and, after two public meetings, adopted a compromise policy, as follows:
Whereas the GCPS recognizes that some students question their gender identities, and
Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.
■Gloucester High School promptly implemented the policy and created three single-stall unisex restrooms for use by all students, regardless of their biological sex or gender identity.
In December 2014, G.G. sought an opinion letter about his situation from the U.S. Department of Education’s Office for Civil Rights, and on January 15, 2015, the Office responded, stating, as relevant here:
The Department’s Title IX regulations permit schools to provide sex-segregated restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes under certain circumstances. When a school elects to separate or treat students differently on the basis of sex in those situations, a school generally must treat transgender students consistent with their gender identity. [The Office for Civil Rights] also encourages schools to offer the use of gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities.
G.G. commenced this action in June 2015, alleging that the Gloucester County School Board’s policy was discriminatory, in violation of the U.S. Constitution’s Equal Protection Clause and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. He sought declaratory relief, injunctive relief, and damages. With his complaint, G.G. also filed a motion for a preliminary injunction “requiring the School Board to allow [him] to use the boys’ restrooms at school.”
The district court dismissed G.G.’s Title IX claim because Title IX’s implementing regulations permit schools to provide separate restrooms “on the basis of sex.” The court also denied G.G.’s motion for a preliminary injunction. As to the Equal Protection claim, the court has not yet ruled *733 on whether G.G. failed to state a claim, but, at the hearing on the motion for a preliminary injunction, it indicated that it “will hear evidence” and “get a date set” for trial to better assess the claim.
From the district court’s order denying G.G.’s motion for a preliminary injunction, G.G. filed this appeal, in which he also challenges the district court’s Title IX ruling as inextricably intertwined with the district court’s denial of the motion for a preliminary injunction.
II
G.G. recognizes that persons who are born biologically female “typically” identify psychologically as female, and likewise, that persons who are born biologically male “typically” identify as male. Because G.G. was born biologically female but identifies as male, he characterizes himself as a transgender male. He contends that because he is transgender, the School Board singled him out for “different and unequal treatment,” “discriminat[ing] against him based on sex [by denying him use of the boys’ restrooms], in violation of Title IX.” He argues, “discrimination against transgender people is necessarily discrimination based on sex because it is impossible to treat people differently based on their transgender status without taking their sex into account.” He concludes that the School Board’s policy addressing restrooms and locker rooms thus illegally fails to include transgender persons on the basis of their gender identity. In particular, he concludes that he is “prevent[ed] ... from using the same restrooms as other students and relegat[ed] ... to separate, single-stall facilities.”
As noted, the School Board’s policy designates the use of restrooms and locker rooms based on the student’s biological sex — biological females are assigned to the girls’ restrooms and unisex restrooms; biological males are assigned to the boys’ restrooms and unisex restrooms. G.G. is thus assigned to the girls’ restrooms and the unisex restrooms, but is denied the use of the boys’ restrooms. He asserts, however, that because neither he nor the girls would accept his use of the girls’ restroom, he is relegated to the unisex restrooms, which is stigmatizing.
The School Board contends that it is treating all students the same way, as it explains:
The School Board’s policy does not discriminate against any class of students. Instead, the policy was developed to treat all students and situations the same. To respect the safety and privacy of all students, the School Board has had a long-standing practice of limiting the use of restroom and locker room facilities to the corresponding biological sex of the students. The School Board also provides three single-stall bathrooms for any student to use regardless of his or her biological sex. Under the School Board’s restroom policy, G.G. is being treated like every other student in the Gloucester Schools. All students have two choices. Every student can use a restroom associated with their anatomical sex, whether they are boys or girls. If students choose not to use the restroom associated with their anatomical sex, the students can use a private, single-stall restroom. No student is permitted to use the restroom of the opposite sex. As a result, all students, including female tó male transgender and male ■ to female transgender students, are treated the same.
While G.G. has pending a claim under the Equal Protection Clause (on which the district court has not yet ruled), only his preliminary injunction challenge and Title IX claim are before us at this time.
Title IX provides:
*734 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ....
20 U.S.C. § 1681(a) (emphasis added). The Act, however, provides, “Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.” Id. § 1686 (emphasis added); see also 34 C.F.R. § 106.32(b) (permitting schools to provide “separate housing on the basis of sex ” as long as the housing is “proportionate” and “comparable” (emphasis added)). Similarly, implementing Regulation 106.33 provides for particular separate facilities, as follows:
A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.
34 C.F.R. § 106.33 (emphasis added). Thus, although Title IX and its regulations provide generally that a school receiving federal funds may not discriminate on the basis of sex, they also specify that a school does not violate the Act by providing, on the basis of sex, separate living facilities, restrooms, locker rooms, and shower facilities.
While G.G. only challenges the definition and application of the term “sex” with respect to separate restrooms, acceptance of his argument would necessarily change the definition of “sex” for purposes of assigning separate living facilities, locker rooms, and shower facilities as well. All are based on “sex,” a term that must be construed uniformly throughout Title IX and its implementing regulations. See Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (“[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning” (internal quotation marks and citations omitted)); In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013) (“Canons of construction ... require that, to the extent possible, identical terms or phrases used in different parts of the same statute be interpreted as having the same meaning. This presumption of consistent usage ... ensure[s] that the statutory scheme is coherent and consistent” (alterations in original) (internal quotation marks and citations omitted)); see also Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d 425, 440 (4th Cir.2003) (“[B]eeause a regulation must be consistent with the statute it implements, any interpretation of a regulation naturally must accord with the statute as well” (quoting John F. Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L.Rev. 612, 627 n. 78 (1996))).
Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females. An individual has a- legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts are not exposed to persons of the opposite biological sex. Indeed, courts have consistently recognized that the need for such privacy is inherent in the nature and dignity of humankind. See, e.g., Doe v. Luzerne Cnty., 660 F.3d 169, 176-77 (3d Cir.2011) (recognizing that an individual has “a constitutionally protected privacy interest in his or her partially clothed *735 body” and that this “reasonable expectation of privacy” exists “particularly while in the presence of members of the opposite sex”); Brannum v. Overton Cnty. Sch. Bd., 516 F.3d 489, 494 (6th Cir.2008) (explaining that “the constitutional right to privacy ... includes the right to shield one’s body from exposure to viewing by the opposite sex”); Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir.2005) (“Students of course have a significant privacy interest in their unclothed bodies”); Sepulveda v. Ramirez, 967 F.2d 1413, 1416 (9th Cir.1992) (explaining that “[t]he right to bodily privacy is fundamental” and that “common sense, decency, and [state] regulations” require recognizing it in a parolee’s right not to be observed by an officer of the opposite sex while producing a urine sample); Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir.1981) (recognizing that, even though inmates in prison “surrender many rights of privacy,” their “special sense of privacy in their genitals” should not be violated through exposure unless “reasonably necessary” and explaining that the “involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating”).
Moreover, we have explained that separating restrooms based on “acknowledged differences” between the biological sexes serves to protect this important privacy interest. See Faulkner v. Jones, 10 F.3d 226, 232 (4th Cir.1993) (noting “society’s undisputed approval of separate public rest rooms for men and women based on privacy concerns”). Indeed, the Supreme Court recognized, when ordering an all-male Virginia college to admit female students, that such a remedy “would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex.” United States v. Virginia, 518 U.S. 515, 550 n. 19, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). Such privacy was and remains necessary because of the inherent “[p]hysical differences between men and women,” which, as the Supreme Court explained, are “enduring” and render “the two sexes ... not fungible,” id. at 533, 116 S.Ct. 2264 (distinguishing sex from race and national origin), not because of “one’s sense of oneself as belonging to a particular gender,” as G.G. and the government as amicus contend.
Thus, Title IX’s allowance for the separation, based on sex, of living facilities, restrooms, locker rooms, and shower facilities rests on the universally accepted concern for bodily privacy that is founded on the biological differences between the sexes. This privacy concern is also linked to safety concerns that could arise from sexual responses prompted by students’ exposure to the private body parts of students of the other biological sex. Indeed, the School Board cited these very reasons for its adoption of the policy, explaining that it separates restrooms and locker rooms to promote the privacy and safety of minor children, pursuant to its “responsibility to its students to ensure their privacy while engaging in personal bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex. [That the school has this responsibility] is particularly true in an environment where children are still developing, both emotionally and physically.”
The need to protect privacy and safety between the sexes based on physical exposure would not be present in the same quality and degree if the term “sex” were to encompass only a person’s gender identity. Indeed, separation on this, basis would function nonsensically. A biological male identifying as female could hardly live in a girls’ dorm or shower in a girls’ shower without invading physiological privacy needs, and the same would hold true for a biological female identifying as male in a boys’ dorm or shower. G.G.’s answer, *736 of course, is that he is not challenging the separation, on the basis of sex, of living facilities, locker rooms, and shower facilities, but only of restrooms, where the risks to privacy and safety are far reduced. This effort to limit the scope of the issue apparently sways the majority, as it cabins its entire discussion to “restroom access by transgender individuals.” Ante at 723. But this effort to restrict the effect of G.G.’s argument hardly matters when the term “sex” would have' to be applied uniformly throughout the statute and regulations, as noted above and, indeed, as agreed to by the majority. See ante at 723.
The realities underpinning Title IX’s recognition of separate living facilities, restrooms, locker rooms, and shower facilities are reflected in the plain language of the statute and regulations, which is not ambiguous. The text of Title IX and its regulations allowing for separation of each facility “on the basis of sex” employs the term “sex” as was generally understood at the time of enactment. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (explaining that courts should not defer to an agency’s interpretation of its own regulation if an “alternative reading is compelled by the regulation’s plain language or by other indications of the Secretary’s intent at the time of the regulation’s promulgation ” (emphasis added) (internal quotation marks and citation omitted)); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (discussing dictionary definitions of the regulation’s “critical phrase” to help determine whether the agency’s interpretation was “plainly erroneous or inconsistent with the regulation” (internal quotation marks and citation omitted)). Title IX was enacted in 1972 and the regulations were promulgated in 1975 and readopted in 1980, and during that time period, virtually every dictionary definition of “sex” referred to the physiological distinctions between males and females, particularly with respect to their reproductive functions. See, e.g., The Random House College Dictionary 1206 (rev. ed.1980) (“either the male or female division of a species, esp. as differentiated with reference to the reproductive functions”); Webster’s New Collegiate Dictionary 1054 (1979) (“the sum of the structural, functional, and behavioral characteristics of living beings that sub-serve reproduction by two interacting parents and that distinguish males and females”); .American Heritage Dictionary 1187 (1976) (“The property or quality by which organisms are classified according to their reproductive functions”); Webster’s Third New International Dictionary 2081 (1971) (“the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change ... ”); The American College Dictionary 1109 (1970) (“the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished ... ”). Indeed, although the contemporaneous meaning controls our analysis, it is notable that, even today, the term “sex” continues to be defined based on the physiological distinctions between males and females. See, e.g., Webster’s New World College Dictionary 1331 (5th ed.2014) (“either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions”); The American Heritage Dictionary 1605 (5th ed. 2011) (“Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions”); Merriam-Webster’s Collegiate Dictionary 1140 (11th ed.2011) (“either of the two major forms of individuals that occur in many species and *737 that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures”). Any new definition of sex that excludes reference to physiological differences, as the majority now attempts to introduce, .is simply an unsupported reach to rationalize a desired outcome.
Thus, when the School Board assigned restrooms and locker rooms on the basis of biological sex, it was clearly complying precisely with the unambiguous language of Title IX and its regulations.
Despite the fact that the majority offers no case to support the definition of “sex” as advanced by G.G. and supported by the government as amicus, the majority nonetheless accepts that the meaning of the' term “sex” in Title IX and its regulations refers to a person’s “gender identity” simply to accommodate G.G.’s wish to use the boys’ restrooms. But, it is not immediately apparent whether G.G., the government, and the majority contend that the term “sex” as used in Title IX and its regulations refers (1) to both biological sex and gender identity; (2) to either biological sex or gender identity; or (3) to only “gender identity.” In his brief, G.G. seems to take the position that the term “sex” at least includes a reference to gender identity. This is the position taken in his complaint when he alleges, “Under Title IX, discrimination ‘on the basis of sex’ encompasses both discrimination based on biological differences between men and women and discrimination based on gender nonconformity.” The government seems to be taking the same position, contending that the term “sex” “encompasses both sex — that is, the biological differences between men and women — and gender [identity].” (Emphasis in ■ original). The majority, however, seems to suggest that the term “sex” refers only to gender identity, as it relies solely on the statement in the Office for Civil Rights’ letter of January 7, 2015, which said, “When a school elects to separate or treat students differently on the basis of sex [for the purpose of providing restrooms, locker rooms, and other facilities], a school generally must treat transgender students consistent with their gender identity.” (Emphasis added). But, regardless of where G.G., the government, and the majority purport to stand on this question, the clear effect of their new definition of sex not only tramples the relevant státutory and regulatory language and disregards the privacy concerns animating that text, it is also illogical and unworkable.
If the term “sex” as used in the statute and regulations refers to both biological sex and gender identity, then, while the School Board’s policy is in compliance with respect to most students, whose biological sex aligns with their gender identity, for students whose biological sex and gender identity do not align, no restroom or locker room separation could ever be accomplished consistent with the regulation because a transgender student’s use of a boys’ or girls’ restroom or locker room could not satisfy the conjunctive criteria. Given that G.G. and the government do not challenge schools’ ability to separate restrooms and locker rooms for male and female students, surely they cannot be advocating an interpretation that places schools in an impossible position. Moreover, such an interpretation would deny G.G. the right to use either the boys’ or girls’ restrooms, a position that G.G. does not advocate.
If the position of G.G., the government, and the majority is that the term “sex” means either biological sex or gender identity, then' the School Board’s policy is in compliance because it segregates the facilities on the basis of biological sex, a satisfactory component of the disjunctive.
*738 Therefore, when asserting that G.G. must be allowed to use the boys’ restrooms and locker rooms as consistent with his gender identity, G.G., the government, and the majority must be arguing that “sex” as used in Title IX and its regulations means only gender identity. But this construction would, in the end, mean that a school could never meaningfully provide separate restrooms and locker rooms on the basis of sex. Biological males and females whose gender identity aligned would be required to use the same restrooms and locker rooms as persons of the opposite biological sex whose gender identity did not align. With such mixed use of separate facilities, no purpose would be gained by designating a separate use “on the basis of sex,” and privacy concerns would be left unaddressed.
Moreover, enforcement of any separation would be virtually impossible. Basing restroom access on gender identity would require schools to assume gender identity based on appearances, social expectations, or explicit declarations of identity, which the government concedes would render Title IX and its regulations nonsensical:
Certainly a school that has created separate restrooms for boys and girls could not decide that only students who dress, speak, and act sufficiently masculine count as boys entitled to use the boys’ restroom, or that only students who wear dresses, have long hair, and act sufficiently feminine may use the girls’ restroom.
Yet, by interpreting Title IX and the regulations as “requiring schools to treat students consistent with their gender identity,” and by disallowing schools from treating students based on their biological sex, the government’s position would have precisely the effect the government finds to be at odds with common sense.
Finally, in arguing that he should not be assigned to the girls’ restrooms, G.G. states that “it makes no sense to place a transgender boy in the girls’ restroom in the name of protecting student privacy” because “girls objected to his presence in the girls’ restrooms because they perceived him as male.” But the same argument applies to his use of the boys’ restrooms, where boys felt uncomfortable because they perceived him as female. In any scenario based on gender identity, moreover, there would be no accommodation for the recognized need for physiological privacy.
In short, it is impossible to determine how G.G., the government, and the majority would apply the provisions of Title IX and the implementing regulations that allow for the separation of living facilities, restrooms, locker rooms, and shower facilities “on the basis of sex” if “sex” means gender identity.
The Office for Civil Rights letter, on which the majority exclusively relies, hardly provides an answer. In one sentence it states that schools “generally must treat transgender students consistent with their gender identity,” whatever that means, and in the next sentence, it encourages schools to provide “gender-neutral, individual-user facilities to any student who does not want to use shared sex-segregated facilities.” While the first sentence might be impossible to enforce without destroying all privacy-serving separation, the second sentence encourages schools, such as Gloucester High School, to provide unisex single-stall restrooms for any students who are uncomfortable with sex-separated facilities, as the school in fact provided.
As it stands, Title IX and its implementing regulations authorize schools to separate, on the basis of sex, living facilities, restrooms, locker rooms, and shower facilities, which must allow for separation on the basis of biological sex. Gloucester High School thus clearly complied with the *739 statute and regulations. But, as it did so, it was nonetheless sensitive to G.G.’s gender transition, accommodating virtually every wish that he had. Indeed, he initially requested and was granted the use of the nurse’s restroom. And, after both girls and boys objected to his using the girls’ and boys’ restrooms, the school provided individual unisex restrooms, as encouraged by the letter from the Office for Civil Rights. Thus, while Gloucester High School made a good-faith effort to accommodate G.G. and help him in his transition, balancing its concern for him with its responsibilities to all students, it still acted legally in maintaining a policy that provided all students with physiological privacy and safety in restrooms and locker rooms.
Because the Gloucester County School Board did not violate Title IX and Regulation 106.33 in adopting the policy for separate restrooms and locker rooms, I would affirm the district court’s decision dismissing G.G.’s Title IX claim and therefore dissent.
I also dissent from the majority’s decision to vacate the district court’s denial of G.G.’s motion for a preliminary injunction. As the Supreme Court has consistently explained, “[a] preliminary injunction is an extraordinary remedy” that “may only be awarded upon a clear showing that the plaintiff is entitled to such relief,” and “ ‘[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy.’” Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22-24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Given the facts that the district court fully and fairly summarized in its opinion, including the hardships expressed both by G.G. and by other students, I cannot conclude that we can “form a definite and firm conviction that the court below committed a clear error of judgment,” Morris v. Wachovia Sec., Inc., 448 F.3d 268, 277 (4th Cir.2006) (quotation marks and citation omitted), particularly when we are only now expressing as binding law an evidentiary standard that the majority asserts the district court violated.
As noted, however, I concur in Part IV of the court’s opinion.