PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HEALTHKEEPERS, INCORPORATED,

    *Plaintiff-Appellant,*

v.

RICHMOND AMBULANCE AUTHORITY,

    *Defendant-Appellee.*

No. 10-1508

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, Chief District Judge.
(3:09-cv-00160-JRS)

Argued: January 27, 2011

Decided: April 25, 2011

Before GREGORY and AGEE, Circuit Judges, and
Irene C. BERGER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Reversed and remanded with instructions by published opinion. Judge Gregory wrote the opinion, in which Judge Agee and Judge Berger joined.

## COUNSEL

**ARGUED:** Gilbert Everett Schill, Jr., MCGUIREWOODS, LLP, Richmond, Virginia, for Appellant. Edwin Ford Ste-

phens, CHRISTIAN & BARTON, LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Brian E. Pumphrey, MCGUIRE-WOODS, LLP, Richmond, Virginia, for Appellant. David B. Lacy, CHRISTIAN & BARTON, LLP, Richmond, Virginia, for Appellee.

---

## OPINION

GREGORY, Circuit Judge:

This case addresses whether ambulance services are encompassed within the definition of "emergency services" as articulated in 42 U.S.C. § 1396u (2011). Plaintiff-Appellant Healthkeepers, Inc. (hereinafter "Healthkeepers") brought this action seeking a declaratory judgment that Defendant-Appellee Richmond Ambulance Authority (hereinafter the "Authority") is required to comply with the rules laid out in § 1396u-2(b)(1)(D) since it is a provider of "emergency services" as defined by the statute. The appeal raises two main issues: (1) whether the definition of emergency services in § 1396u-2(b)(2)(B) applies to § 1396u-2(b)(2)(D) and (2) whether § 1396u-2(b)(2)(D) covers the services provided by the Authority to members of Healthkeepers' Medicaid program.

The district court granted summary judgment in favor of the Authority. The court read the definition of emergency services in § 1396u-2(b)(1)(D) as not encompassing ambulance services. Thus, it found that the Authority is entitled to set its own rates for the ambulance services it provides members of Healthkeepers' Medicaid program. Because we disagree and find that the definition of emergency services in the statute includes emergency services provided by ambulance, we reverse.

## I.

The parties agree on the material facts of this case. In its opinion, the district court does an excellent job of summarizing the key facts which we essentially reproduce below.

This dispute concerns what rate Healthkeepers must pay the Authority when the Authority provides emergency transportation services to Healthkeepers' Medicaid enrollees. A full understanding of this disagreement requires discussion of not only the exact nature of the parties' businesses but also the Medicaid system.

Title XIX of the Social Security Act, §§ 1396-1396v (2011), creates a medical assistance program—known as "Medicaid"—that provides resources to low-income individuals and families for healthcare services. *Harris v. McRae*, 448 U.S. 297, 308 (1980). Medicaid is a cooperative federal-state program. On the federal side, Medicaid is managed by the Secretary of Health and Human Services ("HHS"), who has delegated this authority to HHS's Centers for Medicare and Medicaid Services ("CMS"). In Virginia, the state counterpart to CMS is the Department of Medical Assistance ("DMAS").

DMAS arranges to cover the cost of healthcare for eligible persons in several ways. For some Medicaid-eligible persons, DMAS makes payments directly to providers. This program is called Medallion I. For other Medicaid-eligible persons, DMAS arranges with a type of Health Maintenance Organization ("HMO") called a "Managed Care Organization" ("MCO") to provide those individuals with coverage. This program, which is in effect in Richmond, is called Medallion II. When an MCO enrollee needs medical care, the MCO pays the enrollee's providers.

For non-emergency services, providers who have agreed to a particular payment schedule with the MCO are called "participating," or "contract," providers. These rates need not

track with the rates paid by DMAS to an MCO. MCOs are able to control their costs by pre-negotiating rates for their participants through this system.

However, since 1997, emergency services have been treated differently than non-emergency services. The Balanced Budget Act of 1997 amended the Medicaid Act and specifically § 1396u-2 as follows:

> (b) Beneficiary protections
>
>> . . . .
>>
>>> (2)  Assuring coverage to emergency services
>>>
>>> (A)  In general
>>>
>>>> Each contract with a Medicaid managed care organization . . . shall require the organization or manager—
>>>>
>>>> (i) to provide coverage for emergency services (as defined in subparagraph (B)) without regard to prior authorization or the emergency care provider's contractual relationship with the organization or manager,
>>>>
>>>> . . . .
>>>
>>> (B)  "Emergency services" defined
>>>
>>>> In subparagraph (A)(i), the term "emergency services" means, with respect to an individual enrolled with

an organization, covered inpatient and outpatient services that—

(i) are furnished by a provider that is qualified to furnish such services under this subchapter, and

(ii) are needed to evaluate or stabilize an emergency medical condition (as defined in subparagraph (c)).

(C) "Emergency medical condition" defined

In subparagraph (B)(ii), the term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part.

§ 1396u-2(b)(2). The result of this amendment was that MCOs were unable to pre-negotiate costs with providers of emergency services.

Healthkeepers is a private, for-profit corporation that operates as a commercial HMO as well as an MCO. In Virginia, Healthkeepers offers a managed care plan to Medicaid-eligible persons called "Anthem Healthkeepers Plus" under a contract between Healthkeepers and DMAS.

The Authority was created by the Virginia General Assembly in 1991 and empowered by the City of Richmond to be the sole provider of ambulance emergency services in Richmond. The Richmond Ambulance Authority Act permits the Authority to set its own rates and mandates that "[s]uch rates . . . shall not be subject to supervision or regulation by any bureau, board, commission or other agency of the Commonwealth or of any political subdivision." 1991 Acts of Assembly, c. 431.

The Authority provides emergency services to Healthkeepers' Medicaid-eligible enrollees in its ambulances. This relationship, including payment obligations, was previously governed by a 1992 Agreement, however, since February 28, 2001, there has not been a written contract between the Authority and Healthkeepers for the Anthem Healthkeepers products. Absent a contract, a dispute arose between the parties as to what rate Healthkeepers would have to pay for the services. Healthkeepers asserted that it should pay the rates established by DMAS; the Authority claimed it could charge its own rates. In a 2001 ruling, the Circuit Court of the City of Richmond ruled for the Authority. Since that decision, Healthkeepers has been paying the Authority's rates for services rendered by the Authority to Healthkeepers' Medicaid-eligible enrollees.

The central question in the instant dispute is how, if at all, the 2007 Medicaid Amendments affect the requirement that Healthkeepers continue to pay the Authority's rates. In 2006, Congress passed the Deficit Reduction Act of 2005, which amended the Social Security Act by appending § 1396u-2(b)(2)(D) to follow the statutory language quoted above

(hereinafter the "Medicaid Amendment"). Effective on January 1, 2007, subsection (b)(2)(D) addressed how much an MCO had to pay providers of "emergency services" in certain situations:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full *no more than the amounts* (less any payments for indirect costs of medical education and direct costs of graduate medical education) *that it could collect if the beneficiary received medical assistance* under this subchapter other than through enrollment in such an entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

§ 1396u-2(b)(2)(D)(emphasis added).

Following the enactment of the Amendment, another dispute arose between the parties. Healthkeepers informed the Authority that since (1) the Authority is a "provider of emergency services" that (2) does not have a contract addressing services rendered to Medicaid enrollees with (3) Healthkeepers, a Medicaid managed care entity, the Medicaid Amendment now controls the maximum level of payment the Authority must accept for emergency services provided by ambulance. Under the Medicaid Amendment, that amount would be the amount set by DMAS. The Authority disagreed, arguing that it is not a "provider of emergency services" and that it had a "quantum meruit" contract with Healthkeepers,

both of which removed the Authority from the ambit of the Medicaid Amendment.

In an effort to settle the dispute, Healthkeepers directly asked CMS whether a provider of emergency services in an ambulance would be considered a "provider of emergency services" under the Medicaid Amendment. In a September 2008 letter, CMS responded that "it is our position that the phrase 'provider of emergency services' in section 1932(b)(2)(D) of the Act includes providers of emergency ambulance service when the transportation is needed to evaluate or stabilize an emergency condition and the provider is qualified to furnish these services under title [sic] XIX of the Act." J.A. 341.

Despite attempts to negotiate a resolution to this dispute, the parties were unable to reach an agreement. Consequently, Healthkeepers filed a suit, seeking a declaratory judgment that the Medicaid Amendment covers the services the Authority provides to Healthkeepers' Medicaid enrollees. The district court granted summary judgment in favor of the Authority on April 6, 2010. Healthkeepers timely appealed.

## II.

The outcome of this case rests solely on statutory interpretation. This Court reviews the district court's grant of summary judgment *de novo* since "a question of statutory interpretation, [is] a quintessential question of law . . . ." *Broughman v. Carver*, 624 F.3d 670, 674 (4th Cir. 2010).

We must decide, using the text of the statute, whether ambulance services are included within the definition of "emergency services." At first blush, relying solely on this question in the abstract, this Court is inclined to answer affirmatively since an ambulance is often used to provide emergency services as understood in common vernacular. However, we must try to discover the plain meaning of this

statute using both the text and structure since "statutory con-struction . . . is a holistic endeavor." *United Sav. Assocs. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear." *Id.* (citations omitted).

In order to decide this case, the Court must address two questions of statutory interpretation. First, the Court must decide whether the term emergency services in § 1396u-2(b)(2)(D) should be governed by the definition in § 1396u-2(b)(2)(B). Second, this Court must determine whether the appropriate definition for emergency services encompasses ambulance services.

When conducting statutory analysis, we must first deter-mine whether the meaning of the statute is ascertainable through the text alone. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). "The plainness or ambiguity of statutory lan-guage is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)). This includes employing various grammatical and structural can-ons of statutory interpretation which are helpful in guiding our reading of the text. *See e.g.*, *Timbers*, 484 U.S. at 371.

A.

Addressing the first question, we look to whether the defi-nition in § 1396u-2(b)(2)(B) applies to all references to emer-gency services within the text. Healthkeepers argues that the definition of emergency services in § 1396u-2(b)(2)(B) does not apply to § 1396u-2(b)(2)(D) since the definition in § 1396u-2(b)(2)(B) begins with "[i]n subparagraph 2(A)(i), the term "emergency services" means . . . ." This phrase sug-

gests that the preceding definition only applies to the term "emergency services" in § 1396u-2(b)(2)(A)(i) and might not apply in other sections or subsequently added sections. The Authority argues that the definition in § 1396u-2(b)(2)(B) should apply to all parts of the statute since terms of art used in a statute should be given similar meaning throughout the statute.

To determine which of these analyses is correct, we rely on canons of statutory construction –- two of which were identified by the district court.

The first canon, which supports limiting the definition in § 1396u-2(b)(2)(B) to the term emergency services in § 1396u-2(b)(2)(A)(i), is that all language in the statute should be given full effect. *Clinchfield Coal Co. v. Harris*, 149 F.3d 307, 313 (4th Cir. 1998). "In interpreting a statute, we should strive to give effect to every word that Congress has used" to avoid surplusage. *Id.* This concept represents courts' "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990); *see also Hedin v. Thompson*, 355 F.3d 746, 750 (4th Cir. 2004). This canon favors limiting the scope of the definition in § 1396u-2(b)(2)(B) to subparagraph § 1396u-2(b)(2)(A)(i). Otherwise, the directive "[i]n subparagraph 2(A)(i)" would be surplus language in the statute without any effect.

The second statutory interpretation canon identified by the district court is that "identical words used in different parts of the same act are intended to have the same meaning." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934). Generally, there is a presumption of consistent usage. *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[The] normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same mean-

ing." (citations omitted)); *United States DOL v. N.C. Growers Ass'n*, 377 F.3d 345, 352 n.8 (4th Cir. 2004) (same).

This canon is bolstered by an axiomatic canon of statutory interpretation which states that "to the extent possible, [a court's interpretation should] ensure that the statutory scheme is coherent and consistent." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008). Here, were emergency services given two different meanings in two parts of the statute, there would be inconsistencies in its application to various services.

Furthermore, there is another canon of statutory interpretation which applies by analogy. It is generally assumed that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)(citation omitted). If that is true, then it logically follows that where Congress employs identical language multiple times such as "emergency services," it is also deliberate.

Weighing the various canons of interpretation and reading the statute for plain meaning, we find that applying different definitions to a single term of art within this one statute would be both cumbersome and illogical. The incongruity of this result on the one hand overwhelms any concerns we have over the unsubstantial surplusage on the other hand. Therefore, we affirm the district court's reading of the statute and find that the definition of emergency services found in § 1396u-2(b)(2)(B) applies to § 1396u-2(b)(2)(D).

B.

After finding that emergency services in § 1396u-2(b)(2)(D) is defined by § 1396u-2(b)(2)(B), we turn to whether the services provided by the Authority fit that definition:

In subparagraph (A)(i), the term "emergency services" means, with respect to an individual enrolled with an organization, covered inpatient and outpatient services that—

(i) are furnished by a provider that is qualified to furnish such services under this subchapter, and

(ii) are needed to evaluate or stabilize an emergency medical condition (as defined in subparagraph (c)).

§ 1396u-2(b)(2)(B).

The district court correctly determined that the operative question is whether the phrase "covered inpatient and outpatient services" encompasses ambulance services. However, this is where we part ways with the district court. The district court determined, relying in-part on various dictionary definitions, that the plain meaning of "outpatient" services does not encompass ambulance services.* We disagree and find that ambulance services are encompassed in the term outpatient emergency services.

---

*At oral argument, great attention was given to the debate regarding the appropriate dictionary definition to apply here. The Authority relies on regular dictionaries while Healthkeepers relies on more specialized dictionaries. At oral argument, we noted that courts have relied on both professional dictionaries as well as standard dictionaries in their opinions. *See, e.g.*, *Sullivan v. Stroop*, 496 U.S. 478, 482 (1990) (discussing disputes about relying on Black's law dictionary or a less specialized dictionary to define "child support"); *NVR Homes, Inc. v. Clerks of the Circuit Courts (In re NVR, L.P.)*, 189 F.3d 442, 457 (4th Cir. 1999) (using Black's Law Dictionary to interpret the Bankruptcy code); *see also* Note, *Looking it Up: Dictionaries and Statutory Interpretation*, 107 Harv. L. Rev. 1437, 1445 (1994) (noting the variation in dictionaries relied on by courts). However, this Court finds that since the definitions in dictionaries vary widely as to the word outpatient, it is not compelled by any of the dictionary definitions and relies on the plain meaning of the term outpatient derived from common parlance and the context of the statute.

The term outpatient is not defined within the statute; where a word is not defined within the statute, we turn to its common usage. *Hamilton v. Lanning*, 560 U.S.__, 130 S. Ct. 2464, 2471 (2010).

First we turn to the plain meaning of the term outpatient emergency services. The Authority argues that the term outpatient is meant to encompass only emergency services delivered at a hospital which do not require an overnight visit –– relying on the length of the stay as the sole basis to differentiate inpatient and outpatient services. This reasoning infers that all covered emergency services happen within a hospital. However, this is not supported by a close reading of the text of the definition, which makes no reference to location. Had the statute intended to limit the types of covered services based on location, it would have made clear that emergency services, both inpatient and outpatient, are only delivered once a patient crosses the threshold of the hospital. If that was true, then the distinction between inpatient and outpatient services would be superfluous since they only differentiate the length of stay, which is not relevant to the definition of emergency services.

The definition makes clear that the type of service and who performs the service are the most important factors in determining whether it is an emergency service or not. The first line of the definition is: "the term "emergency services" means, with respect to an individual enrolled with an organization, covered inpatient and outpatient services" and then goes on to highlight the main points of the definition by breaking them into subsections. The two subsections of the definition focus on *who* is providing care and *what* type of care is being delivered. The focus is on the service being provided, not location. Thus, the structure of the definition reveals which parts of the definition were meant to be highlighted. Furthermore, the fact that the statute makes clear that the services need to be performed by "a provider that is qualified to furnish such services" implies that it contemplated

delivery of services outside a hospital where a non-qualified provider might be providing care. § 1396u-2(b)(2)(B). Since only qualified providers administer services within the four walls of the hospital, this concern would not be necessary if emergency services were only contemplated within a hospital.

The structure of the definition supports a reading of the statute which encompasses services outside the hospital. Courts often employ tools which interpret the structure of the statute to discern its true meaning. *Cf. Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (explaining the maxim *ejusdem generis*, the statutory canon that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words") (citation omitted). Here, the definition states that "covered inpatient and outpatient services" apply, which suggests that the spectrum of services fall within its definition. There is no enumerated list of services which would lead the Court to consider a more limited definition of the services. Instead, the statute's structure invites the Court to adopt a broader reading.

Therefore, this Court finds that the term outpatient emergency services encompasses patients being treated outside of the hospital as long as the medical provider and type of service fall within the definition of emergency services.

Next, since we find that the term emergency services must have meant more than services which were rendered at the hospital, we are hard pressed to imagine what might be included in outpatient emergency services if not ambulance services. The services provided by the Authority go to the very heart of the language highlighted in a subsection of the definition. As the Authority conceded at oral argument, the Authority provides services necessary to "evaluate or stabilize an emergency medical condition." § 1396u-2(b)(2)(B). There-

fore, we find that outpatient services must encompass ambulance services.

Finally, we note that a contrary finding would have an inconsistent result and this Court has an obligation to construe statutes as being reasonable. *See United States v. Joshua*, 607 F.3d 379, 387 (4th Cir. 2010) (noting that statutes should be interpreted against absurd results). The logical conclusion of the Authority's argument would compel this court to determine that the other provisions of § 1396u-2(b) do not apply to ambulance services. This would mean, for example, that the Authority would be required to seek pre-approval from Healthkeepers before rendering life saving emergency services in order to be reimbursed. This result is incongruous with the Balanced Budget Act of 1997 which sought to eliminate the need for pre-approval.

Therefore, the plain meaning of the word outpatient and the structure of the statute support a finding in favor of Healthkeepers. The district court thus erred in granting summary judgment to the Authority and failing to grant summary judgment to Healthkeepers. Accordingly, we reverse the judgment of the district court and remand for entry of summary judgment in favor of Healthkeepers.

*REVERSED AND REMANDED WITH INSTRUCTIONS*